UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

ANTWAN M. GRAY,

    Plaintiff,

v.                                          CIVIL ACTION NO. 3:10cv287

UNIQUE AUTO SALES, LLC., et al,

    Defendants

PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

    COMES NOW the Plaintiff, Antwan M. Gray, by counsel, and for his Proposed Findings of Fact and Conclusions of Law, he states:

FINDINGS OF FACT

    1.     The plaintiff, Antwan M. Gray, is a consumer.

    2.     On or about May 16, 2009, Mr. Gray saw a 2001 Chevrolet Tahoe (the "vehicle") on the lot of Unique Auto, a local used car dealer, and began negotiations for its purchase.

    3.     After filling out a credit application to finance the purchase, Unique Auto sent the plaintiff's loan application to numerous potential lenders in hopes Mr. Gray's loan application for the purchase of the vehicle would be approved.

    4.     One of those lenders was Defendant Professional Financial Services of Virginia, LLC ("PFS"), a subsidiary of a larger national auto lender based in South Carolina.

    5.     After PFS received the Plaintiff's credit application from Unique Auto, it obtained and used the Plaintiff's consumer (credit) report to make its lending decision.

6. The plaintiff left the dealership on May 29, 2009 believing the auto deal was finished, the financing was approved by a third party lender, and that Unique Auto would keep its promise that it would process the paperwork with DV to put title in his name, which he believed he had paid them to do.

7. When PFS received the Plaintiff's application and credit report, it then made a near instant credit decision that it would not make the loan to the Plaintiff. This decision was processed by the Defendant's regional manager, Mr. Evans.

8. Mr. Evans was not ordinarily responsible for processing loans directly or for making sure that PFS mailed or provided to consumers copies of any appropriate "adverse action" (denial) notices.

9. Instead, he was filing in for the person – out on personal leave – who he supervised and who would have been responsible for processing the application and making such disclosures.

10. Defendant and its affiliated companies receive and process thousands of consumer loan applications each year and make thousands of adverse credit decisions regarding these applications.

11. PFS does not have any written procedures to ensure its compliance with the adverse action notice provisions of the Equal Credit Opportunity act (ECOA), 15 U.S.C. § 1691(d), or the Fair Credit Reporting Act (FCRA), 15 U.S.C. § 1681m.

12. PFS does not have any written record of having mailed any such notices to the Plaintiff or to other consumers. Instead, it simply throws all of its "denied" files into a monthly box to sort through later if the Defendant is sued or challenged.

13. PFS does not have any admissible evidence that it ever sent an adverse action notice letter to the Plaintiff or any other consumer.

14. Both Mr. Gray and his father have provided unqualified and sworn declarations that the regularly checked the Plaintiff's mailbox during the relevant time period and recall that they did not receive any communication from PFS. This testimony is sufficient to create a disputed question of fact not only that the notice was not received, but as well that it was never mailed.

15. PFS claims that all of its conduct and systems challenged in this case were exactly as it intended. None were accidental or merely negligent.

16. As a result of the ECOA and FCRA violations alleged in this case, the plaintiff has suffered substantial actual damages in the loss of his rights to determine the basis for credit denial, his loss of the credit itself, frustration, anger, humiliation, embarrassment and distress. He was left blind to the "behind the scenes" credit process and relationship of the dealer and PFS and was thus unable to avoid or respond to the otherwise unlawful spot delivery (yo-yo sales) transaction alleged in this case.

## CONCLUSIONS OF LAW

17. The ECOA and FCRA both required PFS to mail the Plaintiff a notice of adverse action containing respective information detailed in each statute. 15 U.S.C. §§ 1691(d); 1681m(a).

18. A lender that fails to provide a written notice of its credit turn down – its adverse action – is liable under both the ECOA and the FCRA. See e.g. Wilder v. Prestige Auto, et al, 3:03cv866 (E.D. Va. April 12, 2005)(D. Dohnal). The statutes seek to eliminate or at least curtail the "behind the scenes" and secretive conduct of parties such as

the defendants in this case. These laws presume that fully informed consumers better facilitate an informed and functional market and business environment. It is in the context of this intent and the important functions they serve that the Equal Credit Opportunity Act, 15 U.S.C. § 1692 et seq., (ECOA) and Fair Credit Reporting Act, 15 U.S.C. § 1681 et seq., (FCRA) should be enforced.

19. As part of the ECOA's comprehensive regulation, a creditor must inform a consumer of the action taken on a credit application within thirty days. 15 U.S.C. § 1691(d). Polis v. American Liberty, Inc. , 237 F.Supp.2d 681 (S.D.W.Va.,2002) (consumer states claim under the ECOA for failure to send timely notice of revocation of credit). Like other consumer protection statutes, attempted compliance is not sufficient. See, Jochum v. Pico Credit Corp., 730 F.2d 1041 (5th Cir. 1984)(untimely notice through a third-party not sufficient); Pierce v. Citibank, 843 F. Supp. 646 (D. Or. 1994)(notice to spouse not sufficient).

20. The ECOA, 15 U.S.C. § 1691(d) requires that a creditor must provide a written notice of the action, within thirty days of taking an adverse action against a credit application. The written notice must state the reasons for the denial or identify the person or office from which a statement of the reasons for the denial may be obtained. 15 U.S.C. § 1691(d)(2). Under the provisions of Regulation B, adverse action includes "[a] refusal to grant credit in substantially the amount or on substantially the terms requested in an application," and "[a] termination of an account or an unfavorable change in the terms of an account that does not affect all or a substantial portion of a class of the creditor's accounts." 12 C.F.R. § 202.2(c)(1)(I) and(ii). If a consumer cannot learn the creditor's minimum standards for accepting credit, the consumer can neither "improve his credit

application, correct any misinformation in his credit record, or guard against discrimination, thus thwarting both the protective and educational objectives of the ECOA." Id.

21.     Similarly, the Fair Credit Reporting Act (FCRA) was passed, in part, because Congress recognized that "[i]naccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system." 15 U.S.C. § 1681(a)(1). It was originally passed as part of the Consumer Credit Protection Act by Public Law 91-508, October 26, 1970, and was extensively amended as part of the Consumer Credit Reporting Reform Act of 1996 Title II, Subtitle D, Chapter 1, of the Omnibus Consolidated Appropriations Act for Fiscal Year 1997, Pub.L.No.104-208, 110 Stat. 3009-426 (enacted Sept. 30, 1996; effective Sept. 30, 1997), codified as amended at 15 U.S.C. § 1681 et seq.

> In a nutshell, it reforms the credit reporting industry--an industry that affects the lives of virtually every working American. Credit bureaus-- especially TRW, Equifax, and Transunion, the big 3--have 450 million files on individual consumers. They process over 2 billion pieces of data each month, and do so at practically the speed of light. The credit reports they compile determine whether a consumer will obtain a mortgage, a car or business loan, a job, and even an apartment.
>
> If these reports are not accurate, or if they are distributed without a legitimate purpose, then our whole society suffers. Consumers may be unfairly deprived of credit, employment, and their privacy. And businesses may lose out on the opportunity to gain new customers.

140 Cong. Rec. H9809, September 27, 1994, Statement of Rep. Kennedy, commenting on the amendments. The FCRA's amendments were necessary because of the explosive combination of economic and technological changes.

> The FCRA was enacted to ensure that the Nation's credit reporting system functioned fairly, accurately, and without undue intrusion into the consumer's privacy. But our country has changed dramatically over the past two decades, and so too has the technology which facilitates the credit reporting system. Credit reports are no longer filed in manila envelopes and stored in metal cabinets. Today, reports are stored, manipulated and relayed by the most sophisticated computers in the world. When the FCRA was passed in 1970, the largest credit bureau had 27 million files on consumers. Today, each of the three largest bureaus keeps files on 170 to 200 million consumers.

140 Cong. Rec. H9810, September 27, 1994, Statement of Rep. Torres. In addition to many other changes, the amended FCRA "expands the required disclosures to consumers when they are denied credit or employment based on a third party's report." Kodrick v. Ferguson, 54 F. Supp.2d 788 , 790 (N.D. Ill. 1999).

22.     When any person uses information from a credit report or information obtained from a third party other than a credit reporting agency, the user is required to provide notice about that use of information. Pursuant to 15 U.S.C. § 1681m(a), a user of a consumer report who takes an adverse action with respect to a consumer must provide a notice about the use of the credit report. The term "adverse action" includes, among many other events, the same events given in 15 U.S.C. § 1691(d)(6) of the ECOA. This notice must be provided when the action "is based in whole or in part on any information in a consumer report." 15 U.S.C. § 1681m(a). When the adverse action is taken on information obtained from third parties other than a consumer reporting agency, 15 U.S.C. § 1681m(b) similarly requires the user to provide a notice to the consumer about the consumer's right to request information about the reason for the action that was taken. Consequently, whether a consumer report is used or information obtained elsewhere, the FCRA requires a notice to the consumer.

23. Although the notices required by the FCRA and the ECOA can be combined, they serve different purposes and each has its own requirements. See Official Staff Commentary to Regulation B, 12 C.F.R. § 202, Supplement I, Comm. 9(b)(2)-9 (explaining how combined ECOA-FCRA notices are permissible but compliance with one Act is not compliance with the other.) As stated in 15 U.S.C. § 1681(a)(1), our "banking system is dependent on fair and accurate credit reporting." By receiving notice of the source of the information that was used to make the decision on the credit, the consumer is able to verify whether that information was correct. "The purpose of the notification provision is to enable the subject of a consumer report to request disclosure from the reporting agency of the nature and scope of the information in his file." See, Fischl v. General Motors Acceptance Corp., 708 F.2d 143, 149 (5th Cir. 1983) (regarding information in consumer reports obtained from credit reporting agencies).

24. Under Virginia law, an addressee's denial of receipt raises an issue of fact to be determined by the jury. Manassas Park Dev. Co. v. Offutt, 203 Va. 382, 385, 124 S.E.2d 29, 31 (1962); Hartford Fire Ins. Co. v. Mut. Sav. & Loan Co., 193 Va. 269, 273, 68 S.E.2d 541, 544 (1952). See also Harleysville Mut. Ins. Co. v. Conner, 2005 WL 2427907, *7 (E.D.Va. 2005). In a nearly identical fact pattern against a different auto lender in a similar autofraud case, the court refused to grant summary judgment upon a far more detailed lender declaration in the face of the consumer's affidavit that he had not received the alleged adverse action notice. The District Court for the District of Arizona explained:

> However, in response, Plaintiff has submitted an affidavit stating that he "never received any notice or other communication from Wells Fargo [Financial]" regarding his September 19, 2002 credit application. (Aff. of Leonard P. Garcia ¶ 10.) When a plaintiff unequivocally denies receipt of

the letter, there exists a genuine issue of material fact. See, e.g., In re Longardner & Assocs., Inc., 855 F.2d 455, 459 (7th Cir. 1988) (finding that denial of receipt alone does not rebut the presumption, but merely creates a question of fact). Thus, the Court, having determined that there exists a factual dispute with respect to Plaintiff's September 19, 2002 credit application, will deny said party's Motion for Summary Judgment with respect to Plaintiff's September 19, 2002 credit application.

Garcia v. Ed Moses Dodge, et al, CIV 04-1299 (D. Arizona, Sept. 14, 2006)

25. ECOA provides for both actual and statutory punitive damages, the later capped at $10,000. ECOA statutory punitive damages are determined based on a list of factors that are not conjunctive: "[T]he court shall consider, among other relevant factors, the amount of any actual damages awarded, the frequency and persistence of failures of compliance by the creditor, the resources of the creditor, the number of persons adversely affected, and the extent to which the creditor's failure of compliance was intentional." 15 U.S.C. § 1691e.

26. Defendant's decisions which resulted in the plaintiff's denial or termination of credit, or placed him in a circumstance which resulted in the taking or the refusal to sell him the vehicle each constituted an "adverse action" under the FCRA. Because the defendant used information obtained from a credit reporting agency at least in part to render such decisions, Defendants willfully violated the FCRA by failing to provide the notice required by §1681m(a).

27. In the alternative of a willful violation, the Defendants' FCRA violations were negligent.

28. A defendant willfully violates the FCRA if its violation was either knowing or reckless. In Safeco Insurance Co. v. Burr, 551 U.S. 47, 127 S.Ct. 2201, 167 L.Ed.2d 1045 (2007), the Supreme Court explained that willful violations under the include "not

only knowing violations of [the statute] but also reckless ones," id. at 57. The Court defined a reckless action as one involving "an unjustifiably high risk of harm that is either known or so obvious that it should be known." Id. at 69.

29. As a result of the above alleged FCRA violations, the defendant is liable to plaintiff for statutory damages from $100.00 to $1,000.00 pursuant to 15 U.S.C. §1681n(a)(1)(A), or for actual damages pursuant to 15 U.S.C. §1681n and §1681o if the amount of actual damages is greater than the statutory amount; defendant is also liable for punitive damages pursuant to 15 U.S.C. §1681n(a)(2), and for attorneys' fees and costs pursuant to §1681n and §1681o.

30. The net (pre-fees and costs) litigation value of each claim is $5,000. This is the figure that has been awarded in a series of comparable adverse action notice cases in this District. This was the amount awarded by the jury in an identical car loan case before now-retired Magistrate Judge Lowe. Parrish v. Greater Mid-Atlantic Finance Company, 3:01CV532. ($5,000 verdict sustained post-trial and attorneys fees awarded as petitioned). It was also the amount awarded by Magistrate Judge Dohnal (later affirmed by District Judge Spencer) in another auto loan case on default judgment. Wilder v. Prestige Auto, et al, 3:03cv866 (E.D. Va. April 12, 2005)(D. Dohnal). In an adverse action mortgage case, District Judge Brinkema awarded $1,750 ($1,000 under the ECOA and $750 under the FCRA) in a case she considered to present no actual damages and no egregious violations. Moreno v. DHI Mortg. Co. GP, Inc., 1:09CV315 LMB/TRJ, 2010 WL 3430816 (E.D. Va. Aug. 27, 2010)

         Respectfully submitted,
         ANTWAN M. GRAY

         _____/s/_____
         Leonard A. Bennett, Esq.
         VSB #37523
         Attorney for Plaintiff
         CONSUMER LITIGATION ASSOCIATES,P.C.
         12515 Warwick Boulevard, Suite 100
         Newport News, Virginia 23606
         (757) 930-3660 – Telephone
         (757) 930-3662 – Facsimile
         lenbennett@cox.net

## **CERTIFICATE OF SERVICE**

   I hereby certify that on this 3rd day of January, 2011,  I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Brett A. Spain
Gary A. Bryant
Wilcox & Savage, P.C.
440 Monticello Avenue, Suite 2200
Norfolk, VA 23510
(757) 628-5500
(757) 628-5566 facsimile
bspain@wilsav.com
gbrant@wilsav.com

   Counsel for Defendant, Professional Financial Services of Virginia, LLC.

         _____/s/_____
         Leonard A. Bennett, Esq.
         VSB #37523
         Attorney for Plaintiff
         CONSUMER LITIGATION ASSOCIATES,P.C.
         12515 Warwick Boulevard, Suite 100
         Newport News, Virginia 23606
         (757) 930-3660 – Telephone
         (757) 930-3662 – Facsimile
         lenbennett@cox.net